IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

SUSAN MUNOZ, LAURETTA KEENE,
and DOROTHY ZINTER,

               Plaintiffs,

     v.

UMATILLA COUNTY, a municipal entity,
JOHN TRUMBO, TERRY ROWAN,
DARREN PARSONS, MARK
GRUENWALD, in their individual
capacities,

               Defendants.

Case No. 2:11-cv-00956-SU

OPINION AND ORDER

SULLIVAN, Magistrate Judge:

       Plaintiffs Susan Munoz, Lauretta Keene, and Dorothy Zinter filed this action against defendants John Trumbo, Terry Rowan, Darren Parsons, Mark Gruenwald,[1] and Umatilla County ("County"), alleging numerous claims under 42 U.S.C. § 1983 and state law. Defendants move for summary judgment pursuant to Fed. R. Civ. R. 56. All parties have consented to a Magistrate Judge in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, defendants' motion is granted as to plaintiffs' federal claims. The remaining state law claims are dismissed without prejudice.

---

[1] At all relevant times, the individually named defendants were employees of the Umatilla County Sheriff Department; John Trumbo and Terry Rowan were Sheriff and Undersheriff, respectively, and Darren Parsons and Mark Gruenwald were Deputies.

## BACKGROUND[2]

Ms. Zinter, the mother of both Ms. Munoz and Ms. Keene, owns a parcel of land, located at 2045 West Orchard, in Hermiston, Oregon. Sherman Decl. Ex. 1, at 2-3. In the 1990s or 2000s, Ms. Zinter gifted one acre of her property, known as 2035 West Orchard, to Ms. Keene, however, Ms. Keene resided in Ms. Zinter's basement at all relevant times. *Id.* at 3-4; Sherman Decl. Ex. 2, at 2-3. Ms. Munoz and her husband, Sabas Martinez, also lived on Ms. Zinter's property, although they resided in a separate mobile home. Sherman Decl. Ex. 1, at 3-4; Sherman Decl. Ex. 3, at 3.

On April 22, 2009, Ms. Keene was convicted of four counts of animal neglect in the first degree and four counts of animal neglect in the second degree under to Or. Rev. Stat. § 167.330 and Or. Rev. Stat. § 167.325, respectively.[3] Sherman Decl. Exs. 4-5. As a result of these convictions, Ms. Keene was sentenced to bench probation for three years and precluded from possessing or owning any farm or domestic animal for five years pursuant to Or. Rev. Stat. § 167.332.[4] *Id.*

On August 9, 2009, Luanne and Eugene Gardner reported to the County that there were "10 to 15 dogs [on Ms. Zinter's property and] one got hit by a car" but did not receive any veterinary treatment. Sherman Decl. Ex. 6. On August 10, 2009, the County received another animal-related complaint; an anonymous caller stated that "[Ms.] Keene has several dogs [she] does not take care

---

[2]  All background information is taken from summary judgment evidence furnished by the parties. The only non-duplicative evidence submitted by plaintiffs consists of excerpts from Ms. Munoz's deposition regarding why her husband would have denied ownership of the injured dog, the declaration of Ms. Munoz, an x-ray report of the injured dog's corpse, and a copy of the County's "Use of Force Policy." *See* Pls.' Resp. to Mot. Summ. J. Exs. 2, 5; Munoz Decl. Ex. A. The Court will cite to defendants' evidence except when referring to the non-duplicative information produced by plaintiffs.

[3]  A person commits the crime of animal neglect in the first degree if he or she "intentionally, knowingly, recklessly or with criminal negligence [f]ails to provide minimum care for an animal in the persons custody or control and the failure to provide care results in serious physical injury or death to the animal." Or. Rev. Stat. § 167.330. A person commits the crime of animal neglect in the second degree he or she "intentionally, knowingly, recklessly or with criminal negligence [f]ails to provide minimum care for an animal in such persons custody or control." Or. Rev. Stat. § 167.325. Neither Ms. Keene's April 2009 conviction nor the terms of her probation are at issue in this case.

[4]  This statute makes is unlawful for "a person convicted of [animal neglect in the first or second degree to] possess a domestic animal or any animal of the same genus against which the crime was committed for a period of five years following entry of the conviction." Or. Rev. Stat. § 167.332(1)(a).

of," two of which "have been hit by a car in the past 2 weeks." Sherman Decl. Ex. 7. On August 16, 2009, at approximately 5:05 p.m., Adam Cline called the County to report there were "15 dogs, mostly border collies" on plaintiffs' properties. Sherman Decl. Ex. 8, at 3. Mr. Cline remarked further that one of these dogs "has been hit by a truck, and has had this problem for at least 4 days." *Id.*; Gruenwald Decl. ¶ 6. According to Mr. Cline, "[t]he owners have been home but have not done anything about it." *Id.*

At approximately 6:10 p.m., Deputy Gruenwald responded to Mr. Cline's report. Gruenwald Decl. ¶ 6. Deputy Gruenwald "knew that [Ms.] Zinter and [Ms.] Keene lived at the property" because he had been there previously "in response to complaints about animals." *Id.* at ¶¶ 5, 7; Gruenwald Decl. Ex. A, at 1. He therefore asked dispatch to check the conditions of Ms. Keene's probation. Gruenwald Decl. ¶ 7. When Deputy Gruenwald arrived on scene, he "did not see any 'No Trespassing' signs on the property," although two such signs were posted. *Id.*; Munoz Decl. ¶ 7. From the driveway, Deputy Gruenwald observed "approximately 15 to 20 dogs, the majority of which were on [Ms. Keene's adjacent property]," as well as a horse inside a small corral. Gruenwald Decl. ¶ 8; Gruenwald Decl. Ex. A, at 1-2. He could not see any food in any of the dogs' dishes and the horse's water was dirty. Gruenwald Decl. ¶ 8; Gruenwald Decl. Ex. A, at 2; *see also* Cline Decl. ¶ 7 ("[w]hen I met Deputy Gruenwald, I observed that many of the dogs on the properties looked malnourished"). Deputy Gruenwald then saw a black and white "malnourished and very thin [border collie-type dog] dragging its hind legs as it moved." Gruenwald Decl. ¶ 9; Gruenwald Decl. Ex. A, at 2. He contacted the on-call supervisor, Undersheriff Rowan, who counseled him to "dispose of the dog on scene if possible" and, if not possible, contact the Humane Society of Eastern Oregon ("Pet Rescue") "to come and euthanize the dog." *Id.* Deputy Gruenwald and Undersheriff Rowan also discussed the possibility of seizing the remaining animals with the help of Pet Rescue due to the numerous animal-related complaints the County had received in association with plaintiffs' land. Gruenwald Decl. ¶ 10; Gruenwald Decl. Ex. A, at 2. Deputy Gruenwald managed to catch the injured dog and, with the help of Mr. Cline, placed it inside a pet carrier that he found on scene. Gruenwald Decl. ¶ 11; Gruenwald Decl. Ex. A, at 2.

At approximately 6:35 p.m., Ms. Keene arrived home from work. *Id.* Deputy Gruenwald

asked Ms. Keene if the dogs had any food. *Id.* She replied that they did not, although she was planning on buying some. *Id.* At approximately 6:41 p.m., Deputy Gruenwald advised Ms. Keene of her Miranda rights. Gruenwald Decl. ¶ 12; Gruenwald Decl. Ex. A, at 2; Sherman Decl. Ex. 2, at 6. Ms. Keene indicated that she understood her rights and agreed to speak with Deputy Gruenwald about the animals on her property. Gruenwald Decl. ¶ 12; Gruenwald Decl. Ex. A, at 2. Accordingly, Deputy Gruenwald asked Ms. Keene how many of the dogs were hers and she responded: "I have my five dogs . . . some of these dogs are my sister's," including the injured one. Gruenwald Decl. ¶ 13; Gruenwald Decl. Ex. A, at 3; Sherman Decl. Ex. 2, at 4-5. Ms. Keene explained that she knew the border collie had been injured for "about a week" because it had difficulty using its hind legs to walk. *Id.*; *see also* Sherman Decl. Ex. 3, at 5-6 (Ms. Munoz testifying that the injured dog had been injured and "dr[a]g[ging] her back hind legs for a couple of days"). She recalled that Ms. Munoz was considering taking the injured dog into the veterinarian the following week "if she doesn't show more movement." Sherman Decl. Ex. 2, at 4; Gruenwald Decl. Ex. A, at 3; Sherman Decl. Ex. 3, at 5; *see also* Cline Decl. ¶ 5 (Mr. Cline recounting that he spoke with Ms. Zinter on August 12, 2009, about the injured dog and she informed him "that her daughter planned to take the dog to a veterinarian").

Mr. Martinez subsequently appeared at his residence. Gruenwald Decl. ¶ 14; Gruenwald Decl. Ex. A, at 3. Deputy Gruenwald asked Mr. Martinez if the injured border collie belonged to his wife, Ms. Munoz, and pointed to the pet carrier. *Id.* Mr. Martinez admitted to owning four dogs, some of which were in his trailer, but he expressly stated that neither he nor his wife owned the injured border collie. *Id.*; *see also* Sherman Decl. Ex. 3, at 4 (Ms. Munoz testifying that in August 2009 she "had five or six" dogs). Deputy Gruenwald tried calling Ms. Munoz twice but got no answer. Gruenwald Decl. ¶ 15; Gruenwald Decl. Ex. A, at 3; Sherman Decl. Ex. 2, at 5.

Deputy Gruenwald also contacted Ms. Zinter, who arrived on scene per his request. Gruenwald Decl. ¶ 15; Gruenwald Decl. Ex. A, at 3. He asked Ms. Zinter who owned the land that the dogs and the horse were on; she remarked it was Ms. Keene's property. *Id.* Deputy Gruenwald next asked Ms. Zinter who owned the animals on that property and she reported they belonged to Ms. Keene, including the injured dog. Gruenwald Decl. ¶¶ 15-16; Gruenwald Decl. Ex. A, at 3;

Page 4 - OPINION AND ORDER

Sherman Decl. Ex. 1, at 6.

Deputy Gruenwald contacted Sheriff Trumbo and apprised him of the situation. Gruenwald Decl. ¶ 17; Gruenwald Decl. Ex. A, at 3. Sheriff Trumbo instructed Deputy Gruenwald "to leave the animals at the scene [so that the County could look into] possibly getting a court order," although he agreed that "the injured dog should be disposed of on scene." *Id.* At approximately 7:25 p.m., Deputy Gruenwald sought assistance from Deputy Parsons. *Id.*; Parsons Decl. ¶ 5. At or around the same time, Pet Rescue arrived on-site and donated a bag of dog food. Gruenwald Decl. ¶ 18; Gruenwald Decl. Ex. A, at 3. Leaving the injured border collie with Pet Rescue "was not an option [because they] did not take injured dogs." Gruenwald Decl. ¶ 18. Deputy Gruenwald asked Ms. Keene to feed the dogs "because at least one [was] vicious." *Id.*; Gruenwald Decl. Ex. A, at 3. Ms. Keene fed most of the canines from three communal dishes and left the remaining food in the opened bag on the ground. Gruenwald Decl. Ex. A, at 3. Deputy Gruenwald inquired whether she was going to feed the other dogs that were tethered at various points on her property. *Id.* at 3-4. Ms. Keene stated that she had forgotten about those animals, but they probably had food. *Id.* at 4. After checking with Deputy Gruenwald and realizing that they were also without food, Ms. Keene fed the tied-up dogs. *Id.*

At approximately 7:32 p.m., Deputy Gruenwald placed Ms. Keene under arrest for animal neglect and violation of her probation. *Id.*; Gruenwald Decl. ¶ 19; Sherman Decl. Ex. 2, at 6. When Deputy Parsons arrived on scene, Deputy Gruenwald showed him the pet carrier and advised that the dog had a broken back, from which he had been suffering for about one week. Parsons Decl. ¶ 6. Deputy Gruenwald informed Deputy Parsons that Undersheriff Rowan had authorized an on-site euthanization of the injured dog. *Id.* at ¶¶ 6-7; Gruenwald Decl. ¶ 17; *see also* Cline Decl. ¶ 8 (Mr. Cline stating that "based on my many years of owning breeding and working with border collies, the injured dog was suffering badly and needed to be euthanized"). He asked Deputy Parsons to dispatch the injured dog because Ms. Keene was in custody and needed to be transported to jail. Parsons Decl. ¶ 7. Deputy Parsons borrowed a shovel from Ms. Zinter, explaining that the injured border collie had a broken back, and dug a hole on Ms. Keene's property. *Id.* at ¶ 8; Gruenwald

Decl. Ex. A, at 4; Sherman Decl. Ex. 1, at 9. He moved the crate alongside the hole and opened it to terminate the injured dog's life. Parsons Decl. ¶ 8. The dog crawled out and attempted to flee, at which point Deputy Parson noticed that it was visibly injured; the border collie's hind legs did not work and were matted and dirty from being dragged along the ground. *Id.*; Sherman Decl. Ex. 1, at 9; *see also* Sherman Decl. Ex. 3, at 6 (Ms. Munoz testifying that the injured border collie traveled approximately 20 yards before being recovered). Deputy Parsons recaptured the dog, shot it twice, and buried it. *Id.*; Gruenwald Decl. Ex. A, at 4; Sherman Decl. Ex. 1, at 10. Neither Ms. Zinter nor Mr. Martinez told the deputies to leave at any point. Sherman Decl. Ex. 1, at 5, 8. They also did not try to stop Deputy Parsons from euthanizing the injured border collie or attempt to get Pet Rescue to intervene on its behalf. Sherman Decl. Ex. 1, at 9-10.

Later on August 16, 2009, Deputy Gruenwald completed and filed an incident report. *See* Gruenwald Decl. Ex. A. On August 17, 2009, Deputy Parsons completed and filed a supplemental incident report. *See* Parsons Decl. Ex. A. Once approved, these reports were sent to the District Attorney's ("DA") office. Sherman Decl. Ex. 9, at 2. Thereafter, Ms. Munoz dug up the injured dog's corpse and, on August 28, 2009, brought it "to Washington State University to be examined." Munoz Decl. ¶ 9; *see also* Sherman Decl. Ex. 3, at 8 (Ms. Munoz testifying that she "took [the border collie's body] out of the ground . . . a couple of days" after it died). She requested only one test - a radiograph - which revealed "no evidence of displacement or fracture of the vertebrae." Munoz Decl. ¶ 9; Munoz Decl. Ex. A.

On October 26, 2010, after independently reviewing the incident reports authored by Deputies Gruenwald and Parsons, the DA's office determined there was probable cause to believe that Ms. Keene unlawfully and with criminal negligence possessed multiple domestic animals for which she failed to provide minimum care. Sherman Decl. Ex. 2, at 6; Patterson Decl. ¶¶ 4-8. As a result, the DA charged Ms. Keene with one count of animal neglect in the first degree, in violation of Or. Rev. Stat. § 167.330, and ten counts of prohibited possession of a domestic animal, in violation of Or. Rev. Stat. § 167.332. Patterson Decl. ¶¶ 6-7; Pachico Decl. ¶ 4. The DA's office did not consult with anyone at the County prior to charging Ms. Keene. Patterson Decl. ¶ 8; Pachico

Decl. ¶ 5; Gruenwald Decl. ¶ 21; Parsons Decl. ¶ 9.

On July 6, 2011, plaintiffs filed a complaint in this Court, alleging the following claims based on the actions of Deputy Gruenwald, Deputy Parsons, Undersheriff Rowan, and Sheriff Trumbo: (1) unreasonable search under the Fourth Amendment in violation of 42 U.S.C. § 1983; (2) unreasonable seizure under the Fourth Amendment in violation of 42 U.S.C. § 1983; (3) conversion; (4) trespass based on property entrance; (5) intentional infliction of emotional distress; (6) malicious prosecution; (7) negligence; and (8) trespass based on disposal of a dog carcass.[5] On November 22, 2011, the Court granted the parties' joint motion to stay this case pending resolution of Ms. Keene's associated criminal charges. Order Granting Joint Motion to Stay (Nov. 22, 2011). On May 9, 2013, the criminal charges against Ms. Keene were dismissed for failure to prosecute in a timely fashion due to the 566-day delay caused by Deputy Gruenwald's military deployment overseas. Pachico Decl. ¶ 5. On August 29, 2013, per the parties most recent joint status report, the stay was lifted. Scheduling Order (Aug. 29, 2013). On August 13, 2014, defendants filed the present motion for summary judgement. Oral argument was held on February 13, 2015.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a

---

[5] Plaintiffs' complaint does not contain any direct allegations against the County. *See generally* Compl. Accordingly, the Court construes the 42 U.S.C. § 1983 claims as asserted solely against the individually named defendants, as plaintiffs have not provided any argument or evidence indicating that a County policy, custom, or practice deprived them of their constitutional rights. *Navicky v. Gevatosky*, 2014 WL 3695527, *2 n.3 (D.Or. July 24, 2014) (citation omitted). Further, plaintiffs "concede [that Ms.] Munoz has no claim for trespass" and the "County is the correct defendant as to all the state law tort claims." Pls.' Resp. to Mot. Summ. J. 2, 7-8. As such, the Court substitutes the County for the individually named defendants in regard to plaintiffs' state law claims. *See* Or. Rev. Stat. § 30.265(3) ("the sole cause of action for any tort of officers, employees, or agents of a public body acting within the scope of their employment or duties . . . shall be an action against the public body only").

dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

This dispute centers on whether defendants' conduct violated plaintiffs' constitutional rights. Defendants argue that they are entitled to summary judgment because: (1) "the search [of plaintiffs' properties and seizure of the injured dog were] conducted under the exception to the warrant requirement of protecting animals"; (2) alternatively, "the search and seizure were incident to the lawful arrest of [Ms.] Keene," for which probable cause existed; and (3) plaintiffs' remaining state law claims fail as a matter of law. Defs.' Mem. in Supp. of Mot. Summ. J. 8-11. In addition, the individually named defendants assert that they "are entitled to qualified immunity" in regard to plaintiffs' federal claims because their conduct was reasonable. *Id.* at 25.

I.    42 U.S.C. § 1983 Claims

Plaintiffs assert that defendants violated their Fourth Amendment rights in myriad respects. First, Ms. Zinter and Ms. Keene contend that the deputies impermissibly entered their properties without a warrant, consent, probable cause, or the existence of an exigency or emergency. Additionally, Ms. Munoz asserts that defendants' termination of her injured dog "was a permanent an[d] irrevocable seizure of the animal [and] was not based on probable cause." Compl. ¶ 32. Finally, Ms. Keene argues that her "seizure and arrest [were] unlawful."[6] *Id.* at ¶ 35.

---

[6] Plaintiffs' complaint devotes less than one sentence to this aspect of their unreasonable seizure claim and, as discussed in greater detail below, the response brief does not meaningfully address this issue. *See, e.g.*, Pls.' Resp. to Mot. Summ. J. 6-7.

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) the conduct complained of deprived him or her of an existing federal constitutional or statutory right; and (2) the conduct was committed by a state actor or a person acting under color of state law. *L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992), *cert. denied*, 508 U.S. 951 (1993). A federally recognized liberty interest to be free from unreasonable searches and seizures exists under the Fourth Amendment. *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (Fourth Amendment does not prohibit all "state-initiated searches and seizures; it merely proscribes those which are unreasonable"). Searches and seizures inside a home or its curtilage "without a warrant are presumptively unreasonable, but that presumption is not irrebuttable." *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1221 (9th Cir. 2014). Among the recognized exceptions are exigency - i.e. where search or seizure is necessary to prevent "the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts" - and emergency - i.e. when officers have "an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm." *Sims v. Stanton*, 706 F.3d 954, 960 (9th Cir. 2013).

It is undisputed that the individually named defendants qualify as state actors for the purposes of 42 U.S.C. § 1983. Therefore, this case initially hinges on whether Deputy Gruenwald, Deputy Parsons, Undersheriff Rowan, or Sheriff Trumbo violated plaintiffs' Fourth Amendment rights or are otherwise entitled to qualified immunity. Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). To ascertain if a government actor is entitled to qualified immunity, the court evaluates whether: (1) the alleged misconduct violated a right; and (2) that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In other words, if the government actor reasonably believed that his or her conduct complied with the law, summary judgment based on qualified immunity is appropriate. *Id.* at 244; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly

incompetent or those who knowingly violate the law").

A.    Unreasonable Search Claim

"Where the government physically occupies private property for the purpose of obtaining information, that is a search within the meaning of the Fourth Amendment." *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012) (citation and internal quotations and brackets omitted). To make a lawful search of curtilage in the absence of a warrant, "officers must have either probable cause and exigent circumstances or an emergency." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (citations omitted). Probable cause exists when, based upon the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also* Sherman Decl. Ex. 11 (County's written search policy). For the emergency or exigency exception to apply in this context, the government must show that: "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect [an animal] from serious harm [or to render immediate aid or assistance to an animal that has suffered serious physical injury]; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 950-52 (9th Cir. 2008); *see also Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (warrantless searches pass Fourth Amendment muster when conducted "to assist persons who are seriously injured or threatened with such injury").[7]

---

[7] The parties have not cited to, and the Court is not aware of, any published precedent from within the Ninth Circuit extending the exigency or emergency exception to animals. Nevertheless, several published state court decisions, including from Oregon, as well as unpublished precedent from within the Ninth Circuit, have applied the exigency exception under analogous circumstances. *State v. Fessenden/Dicke*, 355 Or. 759, 772-76, 333 P.3d 278 (2014); *Leathem v. United States*, 1997 WL 547958, *2 (9th Cir. Sept. 4, 1997); *see also Davis v. State*, 907 N.E.2d 1043, 1050 (Ind.Ct.App. 2009) ("circumstances of animal cruelty may create exigent circumstances to permit a warrantless search of the curtilage"); *Morgan v. State*, 289 Ga.App. 209, 212, 656 S.E.2d 857 (2008) (an exigency exception to the warrant requirement exists "where a police officer reasonably believes that an animal on the property is in need of immediate aid due to injury or mistreatment"); *Mallory v. City of Riverside*, 2014 WL 3818579, *15 (S.D.Ohio Aug. 4, 2014) (collecting cases). Federal courts have been less than precise in distinguishing between the exigency and emergency doctrines. *See Fessenden/Dicke*, 355 Or. at 775-76 n.15; *see also Snipe*, 515 F.3d at 952-53 (defining an emergency, in part, as exigent circumstances). However, the Court need not resolve this issue, as plaintiffs do not dispute that

The court weighs the circumstances from the viewpoint of a reasonable officer at the scene, not using 20/20 hindsight. *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1197 (9th Cir. 2002) (citation omitted). Ultimately, "[t]he determination of whether a search was 'reasonable' under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.'" *Dewey v. Adams*, 2014 WL 3420801, *16 (C.D.Cal. July 9, 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

This Court finds that under either exception to the warrant requirement - i.e. probable cause plus exigent circumstances or an emergency - defendants' search of Ms. Zinter's and Ms. Keene's adjacent properties did not violate the Fourth Amendment. The County received three calls in one week reporting that plaintiffs had 15 to 20 dogs on their land, one of which was severely injured, and none of which were being tended to properly. Sherman Decl. Exs. 6-8; Cline Decl. ¶ 6; Gruenwald Decl. ¶ 6; *see also Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991) ("police officers ha[ve] a duty to conduct an investigation into the basis of [a] witness' report"). Mr. Cline also notified defendants that, on August 12, 2009, Ms. Zinter assured him that "her daughter planned to take the [injured] dog to a veterinarian," yet no such care was obtained in the intervening four days, such that the border collie was still "seriously injured" as of August 16, 2009. Cline Decl. ¶¶ 3-8; Gruenwald Decl. ¶ 6. Further, Deputy Gruenwald had prior knowledge of multiple animal-related complaints associated with plaintiffs' addresses, as well as the terms of Ms. Keene's probation, which precluded her from owning or possessing domestic and farm animals. Gruenwald Decl. ¶¶ 5-7; Gruenwald Decl. Ex. A, at 1; Sherman Decl. Exs. 4-5. When Deputy Gruenwald arrived on scene, he observed several dogs, including the injured border collie, from the driveway. Gruenwald Decl. ¶¶ 7-9; Parsons Decl. ¶ 6; Sherman Decl. Ex. 1, at 8-10; Sherman Decl. Ex. 10; Defs.' Mem. in Supp. of Mot. Summ. J. 10; *see also United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 994 (2013) (a driveway is generally not entitled

---

the exigency and emergency exceptions could or should apply to animals, and precedent is clear that both doctrines are implicated where there is a need to render immediate aid or prevent injury. Thus, for the purposes of evaluating defendants' motion, the Court finds that the exigency and emergency exceptions extend to Fourth Amendment claims involving animals.

to Fourth Amendment protection unless "special features of the driveway itself (i.e. enclosures, barriers, lack of visibility from the street)" create a reasonable expectation of privacy) (citations and internal quotations omitted).[8]

These facts are sufficient to establish a fair probability that Ms. Keene disregarded the terms of her probation, in violation of Or. Rev. Stat. § 167.332, and committed first or second degree animal neglect, in violation of Or. Rev. Stat. § 167.330 or Or. Rev. Stat. § 167.325. This uncontroverted evidence also creates an objective basis to conclude that there was a seriously injured animal in plaintiffs' possession in need of immediate aid. *See Recchia v. City of L.A. Dep't of Animal Servs.*, 2013 WL 5703127, *4-5 (C.D.Cal. Oct. 16, 2013) (given the conditions in plain view to animal control from the sidewalk, "exigent circumstances existed for the officers to search [for] suffering animals"); *Fessenden/Dicke*, 355 Or. at 761-74 (officer investigating a call regarding animal abuse, who observed the animal from the driveway and could see that it was starving, did not violate the Fourth Amendment by entering the defendant's property to investigate further); *Morgan*, 289 Ga.App. at 212 (exigent circumstances existed to justify an officer's warrantless entry into the property owners's backyard where the officer observed malnourished and mistreated animals from the driveway and allegations of animal abuse where made by the neighbor); *see also United States v. Struckman*, 603 F.3d 731, 741 (9th Cir. 2010) ("the fact that the police officers went to the house in response to [the neighbor's] 911 report to look around the area and, perhaps, ask questions was consistent with what citizens expect from law enforcement"); Pls.' Resp. to Mot. Summ. J. 6 ("[a]t best, Deputy Gruenwald had reasonable suspicion to inquire further and request aid for the animal from the owner or the caregiver of the animal"). Accordingly, probable cause plus exigent or

---

[8] Plaintiffs do not provide any argument or evidence indicating that they possessed "an actual, subjective expectation of privacy" in their driveway, beyond noting that two "No Trespassing" signs were erected. *Maisano v. Welcher*, 940 F.2d 499, 503 (9th Cir. 1991), *cert. denied*, 504 U.S. 916 (1992); Munoz Decl. ¶ 7; *see also State v. Rodal*, 161 Or.App. 232, 239, 985 P.2d 863 (1999) ("it is well established that social and legal norms presume that, in the absence of evidence of intent to exclude others, an occupant impliedly consents to allowing business or casual visitors to walk up to the front door") (citations omitted). Aside from the fact that Deputy Gruenwald testified he did not see any such warnings, which plaintiffs do not refute, "simply posting a 'No Trespassing' sign fails to demonstrate 'that the expectation of privacy was legitimate in the sense required by the Fourth Amendment.'" *United States v. Ernst*, 857 F.Supp.2d 1098, 1108 (D.Or. 2012) (quoting *Oliver v. United States*, 466 U.S. 170, 182 (1984)); Gruenwald Decl. ¶ 7.

Page 12 - OPINION AND ORDER

emergency circumstances existed to allow Deputy Gruenwald to enter plaintiffs' curtilage to investigate whether other animals were being kept on that property and whether any of these animals were injured or in need of assistance.

Once Deputy Gruenwald advanced on plaintiffs' land, he garnered additional information supporting the existence of probable cause and an exigency or emergency. He observed several other dogs, some of which were tied up and malnourished, and none of which had food, as well as a horse with dirty water. Gruenwald Decl. ¶¶ 8-9; Gruenwald Decl. Ex. A, at 1-2; Cline Decl. ¶ 7; *see also* Gruenwald Decl. Ex. A, at 2-4 (Ms. Keene acknowledging that none of the dogs on her property had food). Subsequent conversations with Ms. Zinter, Ms. Keene, and Mr. Martinez created ambiguity regarding the injured dog's ownership. Ms. Zinter indicated that the injured border collie, along with several other dogs and the horse, belonged to Ms. Keene. Gruenwald Decl. ¶¶ 15-16; Gruenwald Decl. Ex. A, at 3. Conversely, Ms. Keene stated that, although she owned several dogs, the injured border collie belonged to Ms. Munoz, whereas Mr. Martinez remarked that the injured dog was neither his nor his wife's. Gruenwald Decl. ¶¶ 13-14; Gruenwald Decl. Ex. A, at 3; Sherman Decl. Ex. 2, at 5. Deputy Gruenwald twice attempted to contact Ms. Munoz, however, he was unable to reach her. Gruenwald Decl. ¶¶ 14-15; Gruenwald Decl. Ex. A, at 3. Accordingly, at the time of Deputy Gruenwald's search, neither plaintiffs nor Mr. Martinez accepted responsibility for owning the injured border collie. Likewise, no adult present offered to take the injured dog into the veterinarian for immediate treatment or provide food for the other dogs on the property. Gruenwald Decl. ¶ 13; Gruenwald Decl Ex. A, at 2-4; Sherman Decl. Ex. 2, at 4; Cline Decl. ¶¶ 4-6; *see also* Pls.' Resp. to Mot. Summ. J. 3 ("[Ms.] Munoz was aware of, and tending to, her injured dog [although this] knowledge was not relayed to [defendants] until after [the dog] was killed").

Finally, the scope and manner of Deputy Gruenwald's search was reasonable. Essentially, Deputy Gruenwald limited his investigation to the curtilage of plaintiffs' properties that patently contained animals. Gruenwald Decl. ¶¶ 7-18; Gruenwald Decl. Ex. A, at 1-4; Sherman Decl. Ex. 10. As such, plaintiffs do not contend that Deputy Gruenwald entered any residence, explored the entire acreage, or administered his search improperly in terms of scope or manner. *See generally* Compl.; Pls.' Resp. to Mot. Summ. J. Indeed, the adults on scene never asked Deputy Gruenwald to leave

or otherwise objected to his presence in any way. Sherman Decl. 5, 8-10. Ms. Zinter even testified that had defendants "called [or] knocked on the door," she "would have let them go look at the [injured] dog." *Id.* at 8; *see also Price v. City of Sutherlin*, 945 F.Supp.2d 1147,  (D.Or. 2013) (search made pursuant to the consent of the property owner does not violate the Fourth Amendment); *Pavao v. Pagay*, 307 F.3d 915, 920-21 (9th Cir. 2002) (implied consent existed where a police officer responded to an emergency 911 call and the resident opened the front door, and subsequently failed to object to the officer's entry). Balancing plaintiffs' right to privacy in their driveway and curtilage against defendants' interest in providing emergency aid to animals in need of food and medical care, the Court finds that Deputy Gruenwald's search was appropriate under the Fourth Amendment based on the totality of the circumstances.[9] Defendants' motion is granted as to plaintiffs' 42 U.S.C. § 1983 unreasonable search claim.

B.    Unreasonable Seizure Claim

Generally, an individual or animal is "seized" within the meaning of the Fourth Amendment "when the officer, by means of physical force or show of authority, terminates or restrains his [or her] freedom of movement . . . through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis, citations, and internal quotations omitted). A warrantless seizure does not violate the Fourth Amendment if the officers had "probable cause or other justification." *Dubner v. City & Cnty. of S.F.*, 266 F.3d 959, 964-65 (9th Cir. 2001) (citation omitted). Regarding the seizure of humans, "[p]robable cause exists when, under the totality of the circumstances known

_____

[9]    Although plaintiffs do not directly argue that Deputy Gruenwald's search was unreasonable because he failed to consider the feasibility of obtaining a warrant prior to entering their properties, they do note that the officer in *Fessenden/Dicke* "believed that a warrant would take too long" and the County's written "Search and Seizure" policy counsels that "[w]hen there is doubt as to whether a search is justified under [the exigent circumstances] exception, the officer should consider [if] there [is] time to obtain a warrant[.]" Pls.' Resp. to Mot. Summ. J. 5-6; Sherman Decl. Ex. 11, at 3. The Court finds that defendants' failure address the practicality of securing a warrant is not dispositive in light of the totality of the circumstances, including the unrefuted fact that Deputy Gruenwald was not dispatched to plaintiffs' properties until after 6 p.m. Gruenwald Decl. ¶ 6; Gruenwald Decl. Ex. A, at 1; *see also United States v. Aman*, 624 F.2d 911, 913 (9th Cir. 1980) ("a warrant is merely one factor to be considered in determining the reasonableness of the search"). Nonetheless, even assuming that defendants' failure to proffer evidence regarding this issue made Deputy Gruenwald's search unlawful, qualified immunity attaches because "[i]t was not clearly established at the time, nor is it now, whether police officers may enter [private property] to render emergency assistance to animals." *Shapiro v. City of Glen Cove*, 236 Fed.Appx. 645, 646 (2d Cir. 2007).

to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Id.* at 966 (citation omitted); *see also* Sherman Decl. Ex. 11 (County's written seizure policy). Concerning the seizure of animals, probable cause exists in this context where, under the totality of the circumstances, a prudent person would believe "that [the person in possession] had neglected the dog and the dog was evidence of that neglect." *State v. Newcomb*, 262 Or.App. 256, 258, 324 P.3d 557 (2014); *see also Fessenden/Dicke*, 355 Or. at 767 (a warrantless seizure is justified when officers have an objectively reasonable belief, based on articulable facts, that the seizure is necessary to render immediate aid or assistance to animals that have suffered). The plaintiff bears the burden of establishing each element of a 42 U.S.C. § 1983 claim, including the lack of consent. *Pavao*, 307 F.3d at 919.

i.    Seizure of Ms. Keene

It is undisputed that Ms. Keene was intentionally seized by defendants without a warrant. As discussed above, because Deputy Gruenwald was lawfully on plaintiffs' curtilage, whether he violated Ms. Keene's Fourth Amendment rights by arresting her for committing multiple misdemeanors pursuant to Or. Rev. Stat. § 167.325, Or. Rev. Stat. § 167.330, and Or. Rev. Stat. § 167.332 depends on the existence of probable cause. Under the terms of her probation, Ms. Keene was explicitly precluded from owning any dogs or horses until 2014. Sherman Decl. Exs. 4-5. Further, defendants provided uncontradicted evidence that Deputy Gruenwald was dispatched to Ms. Zinter's and Ms. Keene's adjacent addresses in response to three animal-related complaints. Sherman Exs. 6-8. Deputy Gruenwald's subsequent lawful search of plaintiffs' properties revealed evidence of animal neglect in plain view. *See Snipe*, 515 F.3d at 952 (if, while responding to an emergency, law enforcement "discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found") (citation omitted); *see also Kentucky v. King*, 131 S.Ct. 1849, 1858 (2011) (evidence of criminal conduct is admissible "provided that [the officers] have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence [in plain view] is made"). Specifically, he observed between 15 and 20 dogs with no food, several of which appeared to be malnourished, and a border collie that was severely injured. Gruenwald Decl. ¶¶ 5-9; Cline Decl. ¶¶ 4-8; Parsons Decl. ¶ 6; Gruenwald

Page 15 - OPINION AND ORDER

Decl. Ex. A, at 1-4.

Once Ms. Keene arrived on scene and was advised of her Miranda rights, Deputy Gruenwald interviewed her. Gruenwald Decl. ¶¶ 12; Gruenwald Decl. Ex. A, at 2. Ms. Keene's responses confirmed that she owned several dogs, none of which had been fed. Gruenwald Decl. ¶ 13; Gruenwald Decl. Ex. A, at 2-4; Sherman Decl. Ex. 2, at 5. Deputy Gruenwald's subsequent exchange with Ms. Zinter corroborated the fact that Ms. Keene had breached the terms of her probation. Gruenwald Decl. ¶¶ 15-16; Gruenwald Decl. Ex. A, at 3; *see also* Sherman Decl. Ex. 1, at 5-7 (Ms. Zinter testifying that, until after the border collie was put down, Ms. Munoz "never told [her] at any time that she actually owned [the injured dog]"). Thus, the uncontravened evidence of record demonstrates that Ms. Keene owned or possessed domestic and farm animals in violation of her probation and Or. Rev. Stat. § 167.332. In addition, the record reveals that Ms. Keene committed the crime of animal neglect in the first or second degree because she "intentionally, knowingly, recklessly or with criminal negligence [f]ail[ed] to provide minimum care for an animal in [her] custody or control."[10] Or. Rev. Stat. §§ 167.325, 167.330; *see also* Or. Rev. Stat. § 167.310(9) (defining "minimum care" as "care sufficient to preserve the health and well-being of an animal," including "[f]ood of sufficient quantity and quality to allow for normal growth or maintenance of body weight," "access to adequate shelter," and "[v]eterinary care deemed necessary by a reasonably prudent person to relieve distress from injury"). Deputy Gruenwald therefore had probable cause

---

[10]   To the extent plaintiffs contend that probable cause was lacking because "[n]owhere in any defense filings is an argument that Deputy Gruenwald determined what, if any, intent could be described to Ms. Keene," their argument is unavailing. Pls.' Resp. to Mot. Summ. J. 6. The requisite level of intent for animal neglect in the first or second degree was confirmed by Ms. Keene's acknowledgment that the dogs on her property had no food, especially coupled with the citizen reports and Deputy Gruenwald's own observations. Gruenwald Decl. ¶¶ 8-9, 13; Gruenwald Decl. Ex. A, at 2-3; Sherman Decl. Exs. 6-8; Cline Decl. ¶¶ 6-7. Ms. Keene's admission that she knew the border collie had been injured for approximately one week further supported the existence of mens rea. Regardless, plaintiffs' assertion wholly ignores the fact that Ms. Keene was acting in contravention of her probation merely by possessing dogs and a horse. Sherman Decl. Ex. 2, at 5-6; Sherman Decl. Exs. 4-5; Gruenwald Decl. ¶¶ 13-16; Gruenwald Decl. Ex. A, at 2-3; *see also* Pls.' Resp. to Mot. Summ. J. 3 ("[p]laintiffs agree that [Ms.] Keene was on probation"). In other words, irrespective of whether Ms. Keene engaged in animal neglect, Deputy Gruenwald had probable cause to believe that she was committing the crime of owning farm and domestic animals in violation of her probation. *See* Or. Rev. Stat. § 167.332; *see also Edgerly v. City & Cnty. of S.F.*, 599 F.3d 946, 954 (9th Cir. 2010) ("probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest").

to arrest Ms. Keene. Defendants' motion is granted as to this issue.

      ii.    <u>Seizure of the Injured Border Collie</u>

     The injured border collie was also intentionally seized by defendants without a warrant. Defendants, however, provided uncontradicted evidence that probable cause and an exigency or emergency existed sufficient to justify the seizure. *See San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir.), *cert. denied*, 546 U.S. 1061 (2005) ("the killing of a person's dog constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest") (citations omitted). Namely, as noted above, the County received three calls detailing that plaintiffs had 15 to 20 dogs on their properties, one of which was seriously injured and in need of veterinary care. Sherman Decl. Exs. 6-8; Cline Decl. ¶ 6; Gruenwald Decl. ¶ 6. When Deputy Gruenwald arrived on scene, equipped with the knowledge of several prior animal-related issues associated with plaintiffs, the three current complaints, and the terms of Ms. Keene's probation, he lawfully viewed several dogs, including the injured border collie, from the driveway. Gruenwald Decl. ¶¶ 5-8; Gruenwald Decl. Ex. A, at 1-2. He could not see any food in any of the dogs' dishes and several appeared to be malnourished. Gruenwald Decl. ¶¶ 8-9; Cline Decl. ¶ 7; Gruenwald Decl. Ex. A, at 2. He contacted his supervisors, Undersheriff Rowan and Sheriff Trumbo, both of whom advised him to "dispose of the [injured] dog" on scene. Gruenwald Decl. ¶¶ 9, 17; Gruenwald Decl. Ex. A, at 2-3.

     Irrespective of these orders, Deputy Gruenwald knew that Pet Rescue "did not take injured dogs." Gruenwald Decl. ¶ 18. Further, pursuant to the County's written "Use of Force Policy," Deputy Gruenwald was "authorized to discharge [his] firearm . . . to kill an animal so badly injured that it should be destroyed to prevent further suffering." Pls.' Resp. to Mot. Summ. J. Ex. 5, at 2; *see also* Gruenwald Decl. ¶¶ 6, 9 (Deputy Gruenwald's sworn statements that the "dog was injured and dragging its back legs around to move"); Parsons Decl. ¶ 6 (Deputy Parsons testifying that Deputy Gruenwald "advised that the dog had a broken back, was suffering, and had been injured for approximately one week"); Cline Decl. ¶¶ 4, 8 (Mr. Cline testifying that the "border collie was seriously injured" for several days, such that "based on [his] many years of owning, breeding and working with border collies, [he thought that] the injured dog was suffering badly and needed to be

euthanized"); Sherman Decl. Ex. 1, at 9 (Ms. Zinter stating that Deputy Gruenwald reported to her that the border collie "had a broken back and he was going to have to put it down"); Sherman Decl. Ex. 2, at 4 (Ms. Keene testifying that the injured dog "had difficulty walking" for several days); Sherman Decl. Ex. 3, at 6 (Ms. Munoz remarking that she knew the border collie was injured because she "saw her dragging her legs").[11] Moreover, as addressed in section I(A), all of the adults on scene refused to accept responsibility for the injured dog. Similarly, no adult present offered to take the injured dog into the veterinarian for immediate treatment or objected to the deputies' presence or actions.

The Court finds that, under these circumstances, probable cause existed to seize the injured border collie as evidence of animal neglect. *See Fessenden/Dicke*, 355 Or. at 772-76 ("the officer's actions were permitted under the exigent circumstances exception to the warrant [such that the] officer's warrantless seizure of the horse was lawful"); *Leathem*, 1997 WL 547958 at *2 ("the officers acted lawfully within the exigent circumstances exception" by seizing unhealthy animals); *Morgan*, 289 Ga.App. at 210-12 (officer had probable cause to seize dogs where he "never saw any evidence that [the defendant] had provided any [shelter,] food or water for any of the dogs, which appeared malnourished"); *Mallory*, 2014 WL 3818579 at *17 (officers had probable cause to seize the defendants' chickens and roosters without a warrant where they had been informed as to suspicions of harboring fowl and cockfighting, were aware that both local and state law prohibited animal cruelty and cockfighting, and observed chickens running around the property with visible injuries); *Recchia*, 2013 WL 5703127 at *5-6 (officers' seizure of sick birds, which were later euthanized by a veterinarian, without a warrant did not violate the plaintiff's Fourth Amendment rights); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("if police are lawfully in a

_____

[11] Plaintiffs' acquisition of a post-mortem x-ray of the injured dog's corpse, which revealed no broken bones, is immaterial for two reasons. *See* Munoz Decl. Ex. A. First, the fact that the border collie did not have a broken back, as Deputies Gruenwald and Parsons believed, does not mean that there was no injury requiring immediate aid to prevent further suffering. Indeed, as discussed herein, Ms. Munoz and Ms. Keene knew that the dog was injured because they had observed it dragging its back legs for several days. More importantly, it is undisputed that defendants did not become aware of this fact until well after the dispositive time frame. *See Gibson*, 290 F.3d at 1197 (the court weighs the circumstances from the viewpoint of a reasonable officer at the scene, not using 20/20 hindsight).

position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant") (citations omitted); *Payton v. New York*, 445 U.S. 573, 587 (1980) ("[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity").

Even assuming that Deputy Gruenwald, Deputy Parsons, Undersheriff Rowan, and Sheriff Trumbo did not have probable cause to seize the dog, they nonetheless reasonably could have believed they did and therefore are shielded by qualified immunity. Plaintiffs have not cited to any authority indicating, either directly or by analogy, that seizing a malnourished and seriously injured animal that has not been provided any veterinary care, despite the owner's knowledge of the injury for approximately one week, was unlawful. *See generally* Pls.' Resp. to Mot. Summ. J.; *see also Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2083 (2011) ("[w]e do not require a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate") (citation and internal quotations omitted); *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 949 (9th Cir. 2012), *reh'g en banc denied*, 708 F.3d 1075 (9th Cir. 2013) (where there is a "lack of on-point precedent," the court is ordinarily "compel[led] to grant qualified immunity") (citations and internal quotations omitted). Conversely, defendants have identified numerous cases demonstrating that seizing an injured or sick animal can be constitutionally proper. *See* Defs.' Mem. in Supp. of Mot. Summ. J. 9-10 (collecting cases).

While veterinary care potentially could have been sought for the injured border collie prior to defendants' euthanization decision, plaintiffs do not assert, and nothing in the record indicates, that defendants were required to obtain such care. *See generally* Pls.' Resp. to Mot. Summ. J. Regardless, it is undisputed that the dog had been seriously injured for approximately one week and plaintiffs have not produced any argument or evidence demonstrating that defendants lacked a good faith, reasonable belief that their actions would assist in ameliorating that animal's suffering. Thus, even accepting plaintiffs' assertion that defendants' conduct was questionable, the Court cannot conclude, based on the record before it, that they knowingly violated the law. *See, e.g.*, *Shapiro*, 236

Fed.Appx. at 646-47. For these reasons, defendants' motion is granted as to plaintiffs' 42 U.S.C. § 1983 claims.

II.    State Law Claims

In addition to their federal claims, plaintiffs assert six state law claims against defendants. Dismissal of plaintiffs' federal claims does not automatically deprive this Court of subject-matter jurisdiction over supplemental state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). Rather, where a district court dismisses "all claims over which it has original jurisdiction," it may, in its discretion, "decline to exercise supplemental jurisdiction" over pendent state law claims. 28 U.S.C. § 1367(c)(3); *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 940 (9th Cir. 2012).

Plaintiffs' pendent claims present novel state law issues regarding animal rights. *See Mfrd. Home Cmty. Inc. v. City of San Jose*, 420 F.3d 1022, 1034 (9th Cir. 2005) (affirming the district court's refusal "to exercise supplemental jurisdiction [where] novel issues of state law" were present). Namely, the parties have not cited to, and the Court is not aware of, any authority addressing whether the value of an injured pet that has been denied veterinary treatment can be compensated through a conversion action. *See J & J Sports Prods., Inc. v. Rivera*, 2014 WL 2809844, *5 (D.Or. June 18, 2014) ("conversion may occur on a spectrum from the most outright, blatant kind of theft to what may be regarded as innocent conversion," such that scienter is not necessarily an element of this cause of action under Oregon law) (citations and internal quotations omitted); Sherman Decl. Ex. 3, at 7-8 (Ms. Munoz testifying that she did not spend any money on the injured border collie, including for its acquisition, except  for the initial inoculations that she administered herself, and had not sought any counseling or medical treatment as a result of the underlying events); *but see Mustola v. Toddy*, 253 Or. 658, 668, 456 P.2d 1004 (1969) (confining the scope of a conversion claim "to its narrowest possible limits when a police officer in an emergency situation exercises control over the arrestee's property"). The Court also notes, although not dispositive at this stage in the proceedings, that plaintiffs have not provided any argument or evidence relating to their alleged entitlement to emotional distress damages under these circumstances. The Court therefore declines to exercise supplemental jurisdiction over plaintiffs'

state court claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (docket # 30) is GRANTED as to plaintiffs' federal claims. Accordingly, plaintiffs' 42 U.S.C. § 1983 claims are DISMISSED with prejudice. The Court declines to exercise supplemental jurisdiction over the remaining claims. As a result, plaintiffs' pendent state law claims are DISMISSED without prejudice, such that they may be refiled in state court.

IT IS SO ORDERED.

Dated this 5th day of March, 2015.


 /s/ Patricia Sullivan_____
Patricia Sullivan
United States Magistrate Judge